No. 31,797

JAMES SULLIVAN, *Appellee*, v. HERBERT I. FINCH et al., *Defendants*, SYLVIA T. FINCH, Intervener, *Appellant*, and THE LEBANON STATE BANK, by CHARLES W. JOHNSON, Receiver.

(36 P. 2d 1023)

Opinion filed November 3, 1934.

E. S. Rice and W. S. Rice, both of Smith Center, and Rhodes E. Cave, of St. Louis, Mo., for the appellant.

A. W. Relihan and T. D. Relihan, both of Smith Center, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The action was one by James Sullivan, a depositor in the defunct Lebanon State Bank, to recover the amount of the

deposit from a director of the bank, Herbert I. Finch. Finch was a nonresident, and Sullivan proceeded by attachment of real and personal property. Finch's wife, Sylvia T. Finch, intervened, and claimed the attached property. The court returned findings of fact and conclusions of law favorable to plaintiff, and rendered judgment accordingly. The intervener appeals.

Finch and his wife have long been residents of St. Louis, Mo. In 1905 or 1906 Finch became a director of the bank. About 1920 he also became vice president, and he continued to hold these offices until the bank closed, on account of insolvency, on June 10, 1930.

Previous to 1919 Finch had a checking account with the bank, and continued to have such an account until the bank closed. At times the account amounted to many thousands of dollars. Mrs. Finch never had an account with the bank. The bank had opportunities to make loans on real-estate mortgage security, but was forbidden to do so. Finch supplied funds to accommodate applicants for such loans. The loans were negotiated by Finch's counsin, C. B. Winegar, first an employee of the bank, then a director, and after 1910 president and active manager of the affairs of the bank. Winegar drew checks on Finch's account for loans, made collection of principal and interest, deposited the proceeds of collections in the account, and reinvested the funds. The volume of business thus done expanded and contracted. When the bank became in a dangerous financial condition, Finch ordered payments of interest coupons to be sent directly to him and not to be credited to his account. When the bank failed, the balance to the credit of Finch was about $6,000.

When the bank closed there were three mortgage loans which had been made from Finch's account, which were outstanding. The notes had never been indorsed, the mortgages had never been assigned, and, after the bank failed, Finch sent the instruments to the First National Bank of Lebanon for collection. Finch indorsed releases on the mortgages for delivery when the mortgages were satisfied.

Finch has not been in Kansas since the Lebanon bank failed. As indicated, Sullivan was obliged to proceed by attachment, and the notes and mortgages in the hands of the First National Bank were attached. Finch made default. Mrs. Finch intervened, and claimed the notes and mortgages.

Mrs. Finch's interplea was verified by her attorney on information and belief. Whether the attorney obtained any information

from her is not disclosed. Although a considerable sum of money and a tract of valuable land were involved, she did not attend the trial and testify. Her deposition in her own behalf was not taken. She is in the attitude of withholding from the court her knowledge of the basis and nature of her claim, if she had any, and the presumption is that what she could say would be to her detriment.

Finch's deposition was taken on behalf of the interpleader. He testified that previous to January, 1919, he had notes and mortgages, acquired in the manner which has been described, and on January 1, 1919, he transferred all of them to his wife. There was no indorsement or assignment of the securities, and no delivery of them by Finch, or acceptance of them by Mrs. Finch. There was no testimony Finch told his wife anything about the transfer, or that she knew anything about it. Winegar knew nothing about it, and he was permitted to go on for ten years doing the real-estate mortgage loan business for Finch, which has been described, just as if nothing had happened.

Finch had an account book labeled "Moore's Modern Methods," and he testified he entered the transfer in his book as follows:

"Date, 1919, 1-1
H. I. Finch Est., Dr............................................. $57,712.00
Transfer to S. T. Finch, interest in Kansas real-estate bonds and
    mortgages, S. T. F. Est., Cr................................. $57,712.00"

Finch was a banker with large experience in the real-estate mortgage loan business. It will be observed the H. I. Finch estate, not Finch, is debted, not credited, and the Sylvia T. Finch estate, not Mrs. Finch, is credited. The debit and credit are for an undefined interest in undescribed Kansas real estate bonds and mortgages transferred to Sylvia T. Finch. There is room for inference the purpose of the peculiar form of this entry was that it might be subject to such explanation as future exigencies might require. Finch testified the entry noted a transfer to his wife to avoid income taxes, and some income tax returns were introduced in evidence which partially served the purpose. Another entry in the book, which was introduced in evidence, follows:

"Date, December 31, 1919.
H. I. Finch estate, Dr.
S. T. Finch estate, Cr., received from H. I. Finch during year,
    increase in mortgages ....................................... $4,925.00
Less decrease in coupons...................................... 445.50
Making a net transfer from H. I. Finch to S. T. Finch of......... $4,469.50"

Finch testified the book contained a complete account of the Kansas real-estate mortgage business by entries identifying Sylvia T. Finch items.

There was no evidence that Mrs. Finch ever saw or heard of this book, either before or after litigation consequent on failure of the bank was commenced. Counsel for the intervener suggests she must have known of the book, because of her income-tax returns. She merely signed income-tax statement prepared for her signature by Finch.

Finch gave the following testimony:

"Mr. Winegar would make the collections of principal and interest on these mortgages transferred to Sylvia T. Finch and they would be deposited in the Lebanon State Bank in the checking account in the name of H. I. Finch. Occasionally witness would send funds to Mr. Winegar for temporary use at the bank and these would be deposited in this account. However, such funds were withdrawn and returned to witness and with this exception no other funds went into said account except of principal and interest on these mortgages.'

This testimony was contradicted by numerous letters from Finch to Winegar, written in the years between 1919 and 1930. Space will not be consumed in reproducing extracts. The letters warranted an inference that the account was kept and used by Finch for his personal purposes, just as any individual engaged in business such as Finch conducted, would keep and use a bank account. A specific item of $6,000, which Finch borrowed and deposited in the account, in connection with a transaction for the benefit of the bank, and distinctly not for any temporary purpose, will be referred to later.

There was much other evidence indicating Finch was the owner of the bank account and of the notes and mortgages, and the court so found. The question was one of fact, and the findings are abundantly supported.

One of the findings reads:

"H. I. Finch, about 1919, for the purpose of reducing his income taxes, orally transferred to his wife, without informing her of said transfer, all the notes secured by real-estate mortgages made by C. B. Winegar. . . ."

It is plain from all the findings relating to the subject that the court used the word "oral" to describe a transfer not evidenced by a delivered writing of some sort, such as would be given in any normal, *bona fide* transaction.

As indicated, a tract of land was attached as the property of Finch. The title stood of record in the name of Mrs. Finch. The land was acquired in this way: The bank made a large loan to W. B.

Amis, and later took, as security, a second mortgage. Actions to foreclose both the first and the second mortgages were commenced. By arrangement with the bank, and before foreclosure sale, Finch took over the first lien, and the land was sold to the bank. In case the land were not redeemed, and it was not, the bank was to hold title for five years. If, within that period, the bank sold the land, Finch was to be reimbursed for the amount of his investment. Otherwise the bank was to convey to Finch. The bank did convey to Finch, and he subsequently quitclaimed to his wife.

The face of the quitclaim deed to Mrs. Finch, considered in connection with the financial condition of the bank and the fact Finch was subject to a stockholder's liability, was sufficient to arouse suspicion. The deed was dated February 15, 1929, was acknowledged January 27, 1930, and was recorded two days later.

Finch admitted the deed was not "formally" delivered to Mrs. Finch. He said he placed it among her papers. There was no evidence she knew she had any papers, especially papers among which she might occasionally find a voluntary deed, and there was no evidence she had any information this deed had been executed.

After the date of the deed, February 15, 1929, Finch continued to assert and exercise privileges of ownership of the land. On March 10, 1929, Finch wrote C. T. Pennington that Finch had a deed to the land, desired to sell it, and desired to know if Pennington would attempt to sell it. On March 24, 1929, Finch again wrote Pennington, asking him to take charge of the land and handle it as Finch's agent. The letter also contained the following:

"If you will handle this for me, I will write to Amis that I now own the land and that you are my agent, and that I have instructed you to notify him to vacate."

On March 30, 1929, Finch wrote Winegar that the land was Finch's property and in Finch's name, and forbade Winegar to rent the land to Amis or any of his family. On March 31 Finch sent to Winegar a notice to quit, to be served on Amis. The notice stated the land, which was described, was the property of Finch, and that Pennington was Finch's agent, to act for Finch in all matters pertaining to the land. The notice was signed by Finch. On April 21, 1929, Finch wrote Pennington with respect to advice received from Pennington not to serve the notice to quit. On September 29, 1929, a lease of the land to H. B. Schoen for a year was executed by Finch, by Winegar as agent. On January 19, 1930, Finch remitted

$100 to Winegar to pay Winegar for insurance on buildings on the land. On July 22, 1930, Finch wrote Roy Snow regarding the Amis land, stating Finch wished to sell "the two quarters which I own," and would prefer to sell both quarters at the same time. On August 10, 1930, Finch again wrote Roy Snow regarding sale of the Amis land, in all respects as if Finch were owner.

There was no evidence that Mrs. Finch had any knowledge, notice, or reason to know, a quitclaim deed to her of the Amis land was signed, or was acknowledged, or was placed of record.

Finch testified he was his wife's agent. Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control and consent by the other so to act. (Restatement, Agency § 1.) There was no evidence that Mrs. Finch ever manifested to Finch any consent that he should act for her in respect to any of the matters involved in this litigation. Sullivan's action was commenced on January 12, 1931. There was no evidence Mrs. Finch knew she had any agent or any business to be conducted by an agent during the twelve-year period of Finch's activity; and she never made any claim to any of the property which Sullivan attached, until after the receiver of the bank commenced an action relating to the land, on February 5, 1931.

The court found the bank was insolvent, that Finch knew its condition, and that the quitclaim deed was made without consideration to hinder, delay and defraud Finch's creditors. The evidence will not be further summarized. It was ample to sustain the findings.

Anticipating that the deed might not be recognized as an effective conveyance, the interpleader fell back on the claim the first lien on the Amis land was taken up by Finch with funds in the bank account which contained nothing but principal of and interest on mortgages which Mrs. Finch owned. A bank deposit slip and the bank's ledger sheets, introduced in evidence, showed a deposit by Finch of $6,000, which his letters to Winegar showed he borrowed to complete the sum of $17,700, paid to take up the first lien on the Amis land.

After the bank failed, Finch filed a claim for the balance of the account to his credit, some $6,000. The receiver paid dividends on the claim amounting to forty-five per cent. The court found in finding No. 13 Finch received these dividends. This part of finding

No. 13 has the distinction of being a finding which the intervener does not assail. There was no evidence Mrs. Finch received these dividends, or that Finch accounted to Mrs. Finch for them as proceeds derived from her bank account.

The intervener contends the deposit slip and the bank ledger sheets showing the deposit of $6,000 to Finch's account, the letters showing Finch borrowed the money to complete the amount necessary to take up the first lien on the Amis land, and other letters pertinent to plaintiff's case, were improperly received in evidence, because they had not been shown to Finch, and he had no opportunity to explain them. Plaintiff was not obliged to exhibit to Finch, in advance, any of the evidence sustaining plaintiff's cause of action. If Finch had any explanations to make, Mrs. Finch should have had him at the trial, where he could have given the explanations by way of defense. Plaintiff appeared and cross-examined Finch when his deposition was taken on behalf of the intervener. Plaintiff was not obliged to take to St. Louis all of Finch's letters on the chance plaintiff might need to use some of them in rebuttal, and what has just been said applies to letters of Finch, admittedly genuine, offered by plaintiff in rebuttal at the trial.

The testimony that Finch filed with the receiver a claim for the bank balance existing when the bank failed, was given by the receiver who took charge when the bank closed. He testified as follows:

"Q. Now, Mr. Durett, I will ask you if Mr. Herbert I. Finch has ever filed any claim with the receiver of the Lebanon State Bank for any deposit that stood in his name in the Lebanon State Bank? A. Yes, he has.

"Q. Was that a written claim that he filed? A. Yes, sir.

"Q. Do you know where that claim is at this time? A. The general receiver did not issue any certificate on it but held the proof of claim, and at this time it is in the office of the bank commissioner.

"Q. At Topeka, Kan.? A. At Topeka, Kan.

"Q. Did you see the claim, Mr. Durett? A. Yes, sir.

"Q. Do you know by whom it was signed? A. Yes.

"Q. You saw the claim that was filed, you stated, did you? A. Yes, sir.

"Q. Did the name of Sylvia T. Finch appear upon the claim in any place? A. Her name did not appear."

Objection was made to part of this testimony on the ground the written document was the best evidence. That Finch received dividends is not questioned. That he filed a written claim for himself was not disputed, and is not now disputed. The witness had

personal knowledge of the facts. The testimony did not relate to documents on which the cause of action was based, but to a collateral matter, and under such circumstances the strict rules relating to best and secondary evidence are relaxed.

Other objections to evidence introduced were without merit.

The interpleader offered in evidence the mandate and the opinion of this court in the case of *Lebanon State Bank v. Finch,* 137 Kan. 114, 19 P. 2d 709, and pertinent portions of the district court record in that case. That case was commenced by the receiver of the bank to enforce Finch's stockholder's liability, and to enforce the statutory lien on the Amis land, as Finch's property. Finch did not contest the receiver's claims. Mrs. Finch was made a party and answered, claiming the land as her own. The judgment of this court was, in effect, that she should recover. Pursuant to the mandate, judgment in her favor was entered by the district court. Many of the questions involved were the same as those involved in the present case. The court refused to admit the evidence, and the intervener complains.

The intervener contends the final judgment of the district court was a muniment of title as sacred as any she could have obtained, and should have been admitted, not as conclusive against Sullivan, but for what it was worth. It was not worth anything as against Sullivan. He was not a party to the receiver's suit, did not participate in its prosecution or defense, and nothing that was done or adjudicated had any bearing on the validity or the invalidity of Sullivan's claims. This is elementary, and the intervener cites no authorities to the contrary.

The intervener makes numerous complaints of the findings of fact. Some of the complaints are hypercritical, and some are otherwise of no consequence, as affecting the merits of the action. Those of importance are based on untenable premises, dealt with in part by what has been said. It would serve no useful purpose to discuss the complaints *seriatim.* Assignments of error which have not been referred to have been considered, and are deemed to be without substantial merit.

The judgment of the district court is affirmed.